UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| JAMES OWENS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 4:18-CV-01721-NCC |
| | ) |
| UNITED STATES OF AMERICA | ) |
| and BENJAMIN HARRIS, | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM AND ORDER**

This matter is before the Court on Defendant Benjamin Harris' Petition for Certification of Scope of Employment (Doc. 24) and Defendant United States of America's interrelated Motion to Dismiss for Lack of Subject Matter Jurisdiction (Doc. 29). The Petition and the Motion are fully briefed and ready for disposition.[1] The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to Title 28 U.S.C. § 636(c) (Doc. 13). For the following reasons, Defendant Benjamin Harris' Petition will be **DENIED**, and Defendant United States of America's Motion will be **GRANTED**.

**I. Background**

On November 9, 2018, Plaintiff James Owens ("Owens" or "Plaintiff") filed his First Amended Complaint pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671, *et seq.*, against Defendant United States of America ("United States") (Count I) and for negligence under Missouri state law against Defendant Benjamin Harris ("Harris") (Count II) alleging Harris, a United States Postal Service ("USPS") employee, injured Owens in a motor vehicle accident

---

[1] Defendant Harris has not filed a reply to Defendant United States' opposition to the Petition and the time to do so has elapsed. *See* E.D. Mo. L.R. 4.01.

while driving a USPS vehicle on June 1, 2016 (Doc. 5).  Specifically, the record shows Harris was employed as a City Carrier for the USPS and was assigned 63028 City Route 02 (the "Postal Route"), a mixed route with commercial and residential addresses requiring driving, parking, and walking (Doc. 7 at ¶5; Deposition of Benjamin Harris at 10:16-21, Docs. 28-1, 30-1, 32-10, 34-10 (hereinafter "Harris Depo."); Deposition of Richard Finch at 137:12-138:6, Docs. 25-1, 28-2, 30-2, 32-1, 34-1 (hereinafter "Finch Depo.")).  At 1:15 p.m., Harris, in the operation of his postal vehicle, was involved in an accident at 501 Maple Street (PS Form 1769/301 Accident Report, Docs. 25-6, 32-6, 34-6 (hereinafter "Accident Report")).

At the time of the accident, the following was the relevant practice and procedure of the USPS.  The USPS designs delivery routes such that the workload for each route fills an 8-hour workday for the postal carrier (or "carrier") assigned to the route and that there is no excessive undertime or overtime on the route, as the USPS strives for "an equitable and feasible division of the work among all of the carrier routes assigned to a [post] office" (USPS Handbook M-39: Management of Delivery Services, at 242.122, 243.22, Docs. 28-3, 30-3 (hereinafter "USPS Handbook M-39")).[2]  Each route is also analyzed at least once a year to ensure that it remains as close to an 8-hour workday for the assigned carrier as possible (USPS Handbook M-41: City Delivery Carriers Duties and Responsibilities, at 912, 918.1, Docs. 28-4, 30-4 (hereinafter "USPS Handbook M-41")).  The analysis involves a management official accompanying a carrier on the carrier's assigned route and recording data about when, among other things, the

---

[2] USPS Handbook M-39 provided by Defendant United States indicates an effective date of June 2019, nearly three years after the accident underly this action.  However, the parties do not dispute the wording or the applicability of the provisions of the Handbook as cited herein.  Indeed, the Handbook was admitted as an exhibit and referenced without any objection during the deposition of Richard Finch (Finch Depo. 67:25-68:1).  Thus, the Court will cite to the

carrier left the post office, arrived at the first delivery point, arrived at each address on the route, took 10-minute breaks, took a lunch, went to the restroom, and returned to the post office after all mail was delivered (*See* USPS Inspection of Letter Carrier Route, B.S. Harris, September 23, 2015, Docs. 28-8, 30-8, 32-11, 34-11).  Each route has a prescribed delivery order (USPS Handbook M-39 at 125.3).  Specifically, "[c]arriers are required to follow their authorized lines of travel at all times" (*Id.*).  Carriers are required to sort their assigned mail in accordance with the delivery order before they leave the Post Office in the morning, and then they are required to deliver that mail in that prescribed order unless authorized to deliver differently (USPS Handbook M-39 at 125.1, 125.25, 125.3; Finch Depo. at 13:22-15:13).  Carriers may not loiter or stop to converse unnecessarily on their route (USPS Handbook M-41 at 112.28).  Additionally, carriers are instructed, "Do not deviate from your route for meals or other purposes unless authorized by your manager or if local policies concerning handling out of sequence mail permit minor deviations" (USPS Handbook M-41 at 131.31).  Carriers are "required to follow their authorized lines of travel at all times.  On motorized routes this includes travel to and from: the route, authorized lunch locations, break locations, refueling locations, collection boxes, and on the route" (USPS Handbook M-39 at 125.3).  Further, carriers are prohibited from using their assigned postal vehicles for personal use (USPS Handbook M-39 at 125.3; USPS Handbook M-41 at 112.28, 131.31, 131.32; Finch Depo. at 159:2-7).

      The USPS break policy is as follows.  Carriers are allowed two types of work breaks each day in addition their 30-minute lunch break (Finch Depo. at 89:2-91:3).  First, they are allowed unlimited "comfort breaks" (Finch Depo. at 89:17-90:1).  The USPS does not have a formal or

---

version of Handbook M-39 provided by Defendant United States.

written definition of the term "comfort break." At his deposition, Finch explained that "a comfort stop includes using the restroom or getting a drink to cool down. Comfort is what it's for" (Finch Depo. at 89:14-16; 90:11-15). "Reasonable comfort stops will not be deducted from the carrier's actual time" (USPS Handbook M-19 at 242.341). Second, City Carriers are permitted two 10-minute "personal breaks" per day. The two 10-minute breaks, if taken on the street, must be taken separate from each other and separate from the lunch period (*Id.*). Each City Carrier is required to designate two locations they would like to use for such breaks (Finch Depo. at 92:15-19). Owens' residence, 501 Maple Street, was an authorized break location for Harris (Finch Depo. at 94:15-23; Route Base Information, Docs. 25-9, 28-5, 30-5, 32-9, 34-9). The USPS does not require the personal breaks to be taken at any particular time of day (Finch Depo. at 94:23-95:8). Carriers record on PS Form 1564-A, *Delivery Instructions*, the approximate location of their breaks (USPS Handbook M-39 at 242.341).

Harris testified that that the practice at the Festus Post Office did not align with the USPS Handbooks. Specifically, Harris stated that postal employees used their personal breaks for a variety of personal matters, including making trips to Walmart, going home, and going tanning (Harris Depo. at 54:14-24). In fact, during a route supervision, Harris was allowed to take his two ten-minute breaks in non-authorized break locations and was not reprimanded for his choice of locations (Harris Depo. at 91:5-92:24; Notice of Proposed Removal, Docs. 25-2, 25-8, 28-7, 30-7, 32-2, 32-8, 34-2 (hereinafter "Notice of Proposed Removal")). Finch testified at his deposition that, the Carriers will "move [their break] a little bit based on how fast they are, so they might move a location of where they're taking their break, but they don't go back to where they already delivered. We don't allow deviation to go back to where you already delivered"

4

and "[I]t's as you deliver. You can't just go back to it as a break if you've already delivered there. That's deviating" (Finch Depo. at 128:5-7, 135:2-12). Finch further testified that that he "[n]ever disciplined an employee for taking a break at a non-assigned break location" or going over their two ten-minute breaks in a day (Finch Depo. at 96:14-20, 124:19-125:2, 135:13-20; Harris Depo. 89:8-11).

On a normal day, Harris would be on the street delivering mail between 8:00 and 9:00 a.m. depending on the amount of mail assigned to him for delivery (Harris Depo. at 16:23-17:1). On Saturdays, Harris would take all the mail to Crystal City for their P.O. Boxes as "they want their mail at 8:30, so sometimes I – 8:20, 8:25 so I can get them their mail on time" (Harris Depo. at 17:2-6). Harris would also sometimes change the order of delivering mail on his Postal Route because, if he got out early, some of the business were not yet open so he would deliver the residential mail first (Harris Depo. at 17:24-18:5). When this occurred, Harris sought authorization from his supervisor if he intended on backtracking on his Postal Route because "I did it to cover me. That way there's no questions asked" (Harris Depo. at 19:10-20:4).

The USPS uses GPS technology to track movements of its carriers. The GPS Data for Harris on June 1, 2016, reveals the following. Harris arrived at 406 S. Adams Street, his first delivery location, at approximately 8:26 a.m. At approximately 8:51 a.m., Harris delivered mail to Owens at 501 Maple Street, Apt. A. Harris continued delivering mail along his Postal Route including the following specifically relevant events.

| Time | Location/Activity |
|---|---|
| 10:07 a.m. – 10:17 a.m. | Bathroom break. |
| 10:32 a.m. – 10:43 a.m. | Vehicle was parked while Harris rearranged packages in his van for future delivery. |
| 11:10 a.m. – 11:25 a.m. | Harris took a break at Mueller Street and |

5

|  | Schumer Street ("Third Event"). |
|---|---|
| 12:50 p.m. – 1:00 p.m. | Harris completed a delivery to 204 Briar Ridge as part of his normal route and then drove to a nearby K-Mart to pick up some items ("Fourth Event"). |
| 1:00 p.m. – 1:09 p.m. | Harris drove from the K-Mart to a Mobil gas station/convenience store and bought a drink ("Fifth Event"). |
| 1:09 p.m. – 1:15 p.m. | Harris stopped at 501 Maple Street ("Sixth Event"). |
| 1:15 p.m. | The accident occurred. |

(GPS Data for B. Harris, June 1, 2016, Docs. 25-3, 28-9, 30-9, 32-3, 34-3 (hereinafter "GPS Data"); Notice of Proposed Removal).

The parties dispute the characterizations of the Third, Fourth, Fifth, and Sixth Events. The following are the facts regarding these specific events. At 11:10 a.m., Harris took a 15-minute break at Mueller Street and Schumer Street (the "Third Event") (Notice of Proposed Removal at 3). As a part of the accident investigation, Finch asked Harris to explain his stationary events including this one. Finch's recollection was that Harris "replied that this was an actual break because there is such a big hill and it was such a hot day that day and that you sat in your van and cooled off. You continued to state that you did not realize that you extended your break by five (5) minutes" (*Id.*). However, Harris testified during his deposition that this break was a comfort stop (*See* Harris Depo. at 77:23-78:2). Next, Harris completed a delivery to 204 Briar Ridge as part of his normal route and then drove to a nearby K-Mart to pick up some items (the "Fourth Event"). In addition to using the restroom, it is undisputed that Harris decided to run a personal errand and "go grab some dog food for [Owens] to help them out, kind of be kind and nice" (Harris Depo. 37:24-38:2). Harris then drove from the K-Mart to a Mobil gas

6

station where he purchased a soda (the "Fifth Event") (GPS Data; Notice of Proposed Removal). From the Mobil gas station, Harris drove to Owens' apartment and arrived there at 1:09 p.m. (GPS Data; Notice of Proposed Removal). At approximately 1:15 p.m., Harris was in his postal vehicle leaving Owens' apartment to head back to Festus Garden Apartments, to resume delivering mail (GPS Data; Notice of Proposed Removal). *See also* Harris Depo. at 68:10-14 (Q. And then, after you dropped off the dog food, that's when you were going to start delivering your mail again? A. Yeah. I was going back to the route, to the apartments."). Harris had his vehicle in drive instead of reverse and drove into Owens, knocking him through his apartment's exterior wall (GPS Data; Notice of Proposed Removal). At the time of the accident, Mr. Harris was ahead of his schedule for the day (Finch Depo. at 117:20-24).

      Harris had previously taken breaks at Owens' apartment at about this time but was never disciplined or reprimanded for doing so (Finch Depo. at 96:14-20, 124:19-125:2; Harris Depo. at 89:8-18). Harris had also previously run errands for Owens during work hours (Finch Depo. at 96:14-20, 124:19-125:2, 135:13-20; Harris Depo. at 53:11-16, 89:8-18). Finch, Harris' supervisor, testified that he did not know that Harris was stopping to take cigarette breaks at Owens' residence and only became aware of Harris's relationship with Owens after the accident (Finch Depo. at 51:18-23, 86:25-87:7). Harris testified that he never advised a supervisor that he ran errands for Owens while on his breaks because he was on his "personal break" and "chose to help someone out on my break" believing he could drive his postal vehicle to run errands during his break (Harris Depo. at 54: 5-13). Finch testified that the Postal Service only checks the GPS data if a carrier is consistently taking longer to deliver mail than is warranted by the mail volume (Finch Depo. at 17:8-21). Finch stated he did not have a habit of checking Harris' GPS data

from his routes prior to the accident at issue as Finch described Harris as "a hard worker…He always did his route within the time he was supposed to" (Finch Depo. at 24:7-25).

Finch, as Harris' supervisor, conducted an investigation into the accident on behalf of the USPS. Following the investigation, the USPS served Harris with a "Notice of Proposed Removal." The basis for the proposed termination was "deviation from your assigned route without authorization" and "failure to operate your vehicle in a safe manner" (Notice of Proposed Removal). Harris ultimately received a 14-day suspension because of the accident for 1) deviation from his assigned route and 2) failure to operate his vehicle in a safe manner (Grievance Settlement, Docs. 28-10, 30-10). Finch determined that Harris "was not acting in the scope of his employment at the time [of the accident]. He was not where he was supposed to be. And he was in an accident in a location that he shouldn't have been in the first place" (Finch Depo. at 148:3-7).

Harris now petitions this Court to certify, pursuant to 28 U.S.C. § 2679(d)(3), that he was acting within the scope of his employment at the time of the accident, and to dismiss him from this case. Defendant moves the Court to decline certification and to dismiss the claims against the United States for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure.

As a preliminary matter, Harris seeks an evidentiary hearing in this matter pursuant to local rule 4.02 (Doc. 24 at 2). Local rule 4.02 states, in relevant part, that "[a] party requesting the presentation of oral argument or testimony in connection with a motion shall file such a request with its motion or memorandum briefly setting forth the reasons which warrant the hearing of oral argument or testimony." Harris has not set forth any reasons supporting his

request for an evidentiary hearing. Regardless, although it may be necessary for the Court to conduct an evidentiary hearing to resolve the scope-of-employment issue, a hearing is not required in every case. *Anthony v. Runyon*, 76 F.3d 210, 214 (8th Cir. 1996) (citing *Brown v. Armstrong*, 949 F.2d 1007, 1012 (8th Cir. 1991)). An evidentiary hearing should be held if there are material fact issues in dispute. *Brown*, 949 F.2d at 1012. The Court finds that an evidentiary hearing is not warranted in this action as there are not any material facts in dispute. *See McAdams v. Reno*, 64 F.3d 1137, 1145 (8th Cir. 1995).

## II. Analysis

"Federal courts are courts of limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Subject matter jurisdiction is the power of a federal court to decide the claim before it. *Lightfoot v. Cendant Mortg. Corp.*, 137 S. Ct. 553, 562 (2017). To dismiss a complaint for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), "'the complaint must be successfully challenged on its face or on the factual truthfulness of its averments.'" *Swiish v. Nixon*, No. 4:14-CV-2089 CAS, 2015 WL 867650, at *2 (E.D. Mo. Feb. 27, 2015) (quoting *Titus v. Sullivan*, 4 F.3d 590, 593 (8th Cir. 1993)). "Where, as here, a party brings a factual attack, a district court may look outside the pleadings to affidavits or other documents." *Moss v. United States*, 895 F.3d 1091, 1097 (8th Cir. 2018) (citation omitted). In a factual attack "the party invoking federal jurisdiction must prove jurisdictional facts by a preponderance of the evidence." *Id.* Further, Plaintiff bears the burden of proving jurisdiction exists. *Buckler v. United States*, 919 F.3d 1038, 1044 (8th Cir. 2019) (citation omitted). Finally, "[i]t is to be presumed that a cause lies outside [of the Court's] limited jurisdiction, and the

burden of establishing the contrary rests upon the party asserting jurisdiction." *Kokkonen*, 511 U.S. at 377 (citations omitted).

The Federal Tort Claims Act ("FTCA") "confers federal-court jurisdiction in a defined category of cases involving negligence committed by federal employees in the course of their employment." *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 484 (2006); *see also* 28 U.S.C. § 1346(b)(1). "A waiver of sovereign immunity is strictly construed in favor of the United States, and the party bringing suit bears the burden of demonstrating waiver." *May v. United States*, No. 17-04157-NKL, 2017 WL 6419298, at *2 (W.D. Mo. Dec. 15, 2017) (citations omitted). A party bringing suit against the United States therefore bears the burden of proving that the government has unequivocally waived its immunity. *Vardiman v. United States*, No. 4:17CV2358 RLW, 2020 WL 109464, at *3 (E.D. Mo. Jan. 9, 2020). "A threshold requirement to establish jurisdiction under the FTCA is that the federal employee must have been acting within the scope of his employment when the tort was committed." *See Primeaux v. United States*, 181 F.3d 876, 878 (8th Cir.1999) ("In determining the extent of the government's FTCA liability, 'scope of employment' sets the line.") (quoting *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 423 (1995)). The law of the place of the alleged tort governs the scope-of-employment question. *Williams v. United States*, 350 U.S. 857, 857 (1955); *Richards v. United States*, 369 U.S. 1, 10 (1962); *St. John v. United States*, 240 F.3d 671, 676 (8th Cir. 2001). Here, the parties do not dispute that Missouri law applies (Doc. 25 at 5; Doc. 28 at 6-7; Doc. 34 at 2-3).

Under Missouri law, the scope-of-employment inquiry is focused, "not [on] the time or motive of the conduct, but rather [on] whether the act was done by virtue of the employment and in furtherance of the business or interest of the employer." *Ewing-Cage v. Quality Prods., Inc.*,

18 S.W.3d 147, 150 (Mo. Ct. App. 2000) (citation omitted).  Specifically, "[a]n act is within the course and scope of employment if (1) even though not specifically authorized, it is done to further the business or the interests of the employer under her general authority and direction and (2) it naturally arises from the performance of the employer's work." *Higgenbotham v. Pit Stop Bar & Grill, LLC*, 548 S.W.3d 323, 328 (Mo. Ct. App. 2018).  "If the act is naturally incident to the employer's business . . . it is done while engaged in the employer's business." *Ewing-Cage*, 18 S.W.3d at 150 (citation omitted).  Therefore, for an employer to be liable, the employee's negligent or wrongful conduct must not "arise wholly from some external, independent, or personal motive." *H.R.B. v. J.L.G.*, 913 S.W.2d 92, 97 (Mo. Ct. App. 1995) (citation omitted).

In cases involving motor vehicles, Missouri case law affords a rebuttable presumption that the driver of another's vehicle is acting within the course of employment.  *Wills v. Townes Cadillac-Oldsmobile, Inc.,* 490 S.W.2d 257, 259-60 (Mo. 1973).  The presumption arises by showing that the defendant owned or controlled the motor vehicle and that the driver of the vehicle was in the general employ of the defendant.  *Johnson v. Bi-State Dev. Agency,* 793 S.W.2d 864, 867 (Mo. 1990).  Defendant United States concedes that the presumption applies in this instance (Doc. 28 at 6).  "This presumption disappears only when the defendant introduces substantial controverting evidence" that the use of the vehicle at the time was not for the purpose of furthering the employer's business interests in some fashion.  *Ewing-Cage*, 18 S.W.3d at 150 (citation omitted).  "But if there be *other* evidence, it may aid that required to raise the presumption, and the whole considered together sometimes may be sufficient to support the necessary valid inference, even though the *presumption* has been overcome by defendant's evidence." *Snead v. Sentlinger*, 327 S.W.2d 202, 205 (Mo. 1959) (emphasis in original)

11

(citations and internal quotation marks omitted).

Using an employer-owned vehicle outside of authorize parameters may be sufficient to rebut the scope of the presumption. *See Speidel v. Kellum*, 340 S.W.2d 200, 203 (Mo. App. 1960) (finding employee outside the scope of his employment in part because he was not given permission to use the vehicle for his own personal pleasure or that of his friends). Generally, an employee's authorized breaks are considered within the scope of his employment. *See Williams v. Transpo Int'l, Inc.*, 752 S.W.2d 501, 504 (Mo. Ct. App. 1988) (addressing comfort or convenience breaks to satisfy a personal bodily need in the context of workers' compensation). Even if a deviation is not authorized, an employee will be considered to be acting in the scope of his employment if the deviation is minor. *Am. Family Mut. Ins. Co. v. Arnold Muffler*, Inc., 21 S.W.3d 881, 883 (Mo. Ct. App. 2000). The so-called "minor deviation rule" states that if the use made by an employee is not such a gross, substantial, or major violation, even though it may have amounted to a deviation, the deviation will be considered immaterial. *Id.* "In determining whether a violation is minor or material, the court must consider the extent of the deviation in actual distance or time and the purpose for which the vehicle was given." *Id.* "In addition, even if there is a deviation, if the employee has returned to his or her employer's business and to a point where in the performance of duties he or she is required to be, there may be coverage." *Id.*

Plaintiff and Defendant Harris have failed to meet their burden to establish that Defendant Harris was acting within his scope of employment at the time of the accident. Defendant Harris did not have permission to use his postal vehicle to effect the stops at K-Mart, Mobil, and Owens' residence. Even if the Court were to construe the three stops, as asserted by Plaintiff and Defendant Harris, as Harris' first two personal breaks of the day separated by an

authorized comfort stop, both personal stops violated USPS guidelines. The USPS Handbooks are explicit in their limitations regarding vehicle use and deviation. Specifically, USPS Handbooks prohibit the use of the postal vehicle for personal use. Guidelines also regiment a carrier's route and delivery order such that deviations and backtracking, without prior authorization, are not permitted. Postal carriers are additionally prohibited from loitering or stopping to converse unnecessarily on their route. The evidence here indicates that Defendant Harris deviated from his route without authorization using his postal vehicle to run a personal errand for a friend.

Plaintiff and Defendant Harris argue that the practice and procedure of the Festus Post Office was such that Harris had implied permission to use his postal vehicle to run this personal errand and to take a break at Owens' home because carriers at the Festus Post Office, including Harris, had not previously been disciplined for previous similar action despite the GPS tracking of their vehicles. However, GPS tracking is not sufficient to establish authorization. In fact, GPS data was only reviewed as necessary if there was a reason to believe that a carrier was not performing his duties. When USPS learned of Harris' break behavior after the accident, he was disciplined for his deviation in addition to the accident itself. *Shelter Mut. Ins. Co. v. See*, 46 S.W.3d 65, 68 (Mo. Ct. App. 2001), *as modified* (May 29, 2001) (finding driver did not have "implied permission" to use the vehicle to see his friends or to work when owner did not know about these uses and reprimanded driver when he subsequently learned of these incidents). The USPS did not "acquiesce" to Defendant Harris' use of the vehicle to purchase and deliver dog food to a friend. *See id.*

In addition to being unauthorized, these stops amounted to more than a "minor deviation"

from his route.  While the locations involved—K-Mart, Mobil, and Owens' residence—appear to have been in close proximity, Harris spent a total of 25 minutes away from his route, of which 16 minutes were spent running an errand for Plaintiff.  Most importantly, his unauthorized errand was clearly of a personal nature and not in the interests of his employer's business.  *Thomas v. McBride Exp. Co.*, 266 S.W.2d 11, 13 (Mo. Ct. App. 1954)(" [A]ny turning aside from the designated or customary route, where the sole motive is self interest, unmixed with any intent to serve the master, separates the servant from the master's service, regardless of the extent of the deviation.").  Thus, Defendant Harris was acting outside the scope of his employment during both unauthorized personal stops.

Finally, although Harris was in the process of leaving Owens' residence and returning to his route, he was not where he should have been as required to perform his duties and he had not yet returned to the point of deviation at 204 Briar Ridge.  Defendant Harris urges the Court to adopt the reasoning in *Schulte v. Grand Union Tea & Coffee Co.*, 43 S.W.2d 831 (Mo. Ct. App. 1931), a workers' compensation case.  In *Schulte*, the decedent employee, a salesman, left the home of a customer to go back to the house of a woman on his route to "serve a purpose of his own and not that of his employer." *Id.* at 833.  Schulte was in an accident as he returned his work truck to his employer's garage after leaving the woman's residence. *Id.*  The Missouri Court of Appeals determined that at the time the accident occurred, Schulte's deviation from his employer's business had ended because the act of returning his work truck to his employer's garage was an "act of service for his employer." *Id.* at 835.  However, unlike in *Schulte*, Defendant Harris' route and hours of employment were strictly set and monitored. *Id.* at 834. Further, Defendant Harris had not yet left Owens' residence when the accident occurred and was

14

not engaged in an act of service for his employer. Thus, Defendant Harris had not yet returned to the point of deviation or the place where, in performance of his duties, he should be. *Humphrey v. Hogan*, 104 S.W. 2d 767 (Mo. Ct. App. 1937) (holding employee not in the scope of his employment when he deviated from his route and had not returned either to the point of deviation or the place where, in performance of his duties, he should be). *See also Thomas*, 266 S.W.2d at 13 (finding employee not in the scope of his employment when he deviated from his normal route to pick up his son and the accident occurred on his way to pick up his son); *Brown v. Moore*, 248 S.W.2d 553, 557 (Mo. Ct. App. 1952) (finding employee not within the scope of his employment when the employee went on a personal errand three miles out of the way of where he needed to go to deliver a letter for his employer and he had not yet returned to the point of deviation at the time of the accident).

The Court finds that Defendant United States has sufficiently rebutted the presumption afforded by Missouri case law and Plaintiff and Defendant Harris have not met their burden to establish that Harris was acting in the scope of his employment when the accident occurred. Therefore, Defendant United States is entitled to sovereign immunity, and the Court will dismiss Count I against Defendant United States, with prejudice, for lack of subject matter jurisdiction. Furthermore, as Plaintiff's remaining claim against Defendant Harris sounds in state law, the Court will decline to exercise supplemental jurisdiction over the claim and dismiss it without prejudice. 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if the district court has dismissed all claims over which it has original jurisdiction."). *See also Gregoire v. Class,* 236 F.3d 413, 420 (8th Cir. 2000) ("[T]he judicial resources of the federal courts are sparse compared to the states. We stress the need to

exercise judicial restraint and avoid state law issues wherever possible.") (quoting *Condor Corp. v. City of St. Paul,* 912 F.2d 215, 220 (8th Cir. 1990)).

### III. Conclusion

Accordingly,

**IT IS HEREBY ORDERED** that Defendant Benjamin Harris' Petition for Certification of Scope of Employment (Doc. 24) is **DENIED** and Defendant United States of America's interrelated Motion to Dismiss for Lack of Jurisdiction (Doc. 29) is **GRANTED**.  Count I against Defendant United States of America is **DISMISSED, with prejudice** and Count II against Defendant Benjamin Harris is **DISMISSED, without prejudice.**

A separate order of dismissal will accompany this memorandum and order.

Dated this 30th day of June, 2020.

 /s/ Noelle C. Collins  
NOELLE C. COLLINS  
UNITED STATES MAGISTRATE JUDGE
